**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY K. MYERS, | ) | CASE NO. 1:12-cv-250 |
| | ) | |
| Plaintiff, | ) | JUDGE GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Mary K. Myers ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

On October 2, 2008, Plaintiff filed applications for a POD, DIB, and SSI and alleged a disability onset date of February 7, 2007. (Tr. 12.) The applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On August 31, 2010, an ALJ held Plaintiff's hearing. (*Id.*) Plaintiff appeared, was represented by an attorney, and testified. (*Id.*) A vocational expert ("VE") also testified. (*Id.*) On September 20, 2010, the ALJ found that Plaintiff was not disabled. (*Id.*) On December 2, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision. (Tr. 2.)

On February 1, 2012, Plaintiff filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) On July 5, 2012, Plaintiff filed her Brief on the Merits. (Doc. No. 14.) On August 20, 2012, the Commissioner filed his Brief on the Merits. (Doc. No. 15.) Plaintiff did not file a reply brief.

Plaintiff asserts that the ALJ erred in: (1) determining that her back condition did not constitute a severe impairment; (2) providing insufficient rationale for his determination of Plaintiff's residual functional capacity ("RFC"); and (3) failing to explain his credibility finding.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was 31 years old at the time of her administrative hearing. (Tr. 30.) Plaintiff can communicate in English, and completed high school and some college

2

courses. (Tr. 30, 36-37.) She has past relevant work as a cashier, day care worker, service clerk, security guard, clerk typist, data entry clerk, order clerk and statement clerk. (Tr. 19, 39-40.)

### B. Medical Evidence

#### 1. Treating Providers- Bipolar Disorder

In January 2007, Plaintiff was examined by Howard Simon, M.D. and Farhat Shaikh, M.D., at MetroHealth Medical Center Medical Clinic, where she reported a three-year history of depression, for which a prior physician had prescribed Wellbutrin. (Tr. 235-36.) She stated that she had been taking the Wellbutrin as needed, and, during the previous week, had taken it every day after not having taken it for eight months. (Tr. 235.) Dr. Simon diagnosed Plaintiff with depressive disorder, and recommended that she follow up with a psychiatrist. (*Id.*)

On February 5, 2007, Plaintiff was examined by psychiatric advanced practice nurse Michelle Bender, MSN, APRN, BC. (Tr. 238-42.) Plaintiff reported a lifelong history of depression, noting an increase after the birth of her four-year-old son. (Tr. 238.) She complained of constant anger, irritability, difficulty with focus and concentration, and racing thoughts, as well as difficulty sleeping for days at a time. (*Id.*) Nurse Bender diagnosed Plaintiff with bipolar disorder, and recommended that Plaintiff continue taking Wellbutrin. (Tr. 242.) After a February 26, 2007 exam, Nurse Bender opined that Plaintiff's symptoms were in partial remission, but added Geodon, an antipsychotic, to Plaintiff's treatment. (Tr. 246.) Plaintiff was examined by Nurse Bender again in March 2008, when they discussed methods to improve Plaintiff's

3

performance in classes she was attending, such as tape recording lectures, requesting more time on tests, and using outlines. (Tr. 248-89.)

In May 2007, Nurse Bender noted that Plaintiff was working well in school and had done well in her final exams. (Tr. 261.) Nurse Bender recommended discontinuing the Geodon because it was making Plaintiff drowsy, and prescribing Invega, another antipsychotic. (Tr. 263.) On June 8, 2007, Plaintiff reported a "big improvement" in her functioning on the Invega. (Tr. 264.) On June 21, 2007, Plaintiff reported that her ability to study and retain information had improved, and that she was doing well in her on-line courses. (Tr. 267.) On September 11, 2007, Plaintiff reported that she felt that she was generally coping better with issues in her life, despite having failed two summer courses and caring for her mother after knee surgery. (Tr. 274.) Nurse Bender recommended that Plaintiff switch from Invega to Abilify, and that she start taking Lamictal, a mood stabilizer. (Tr. 275.) On September 26, 2007, Plaintiff reported improved concentration. (Tr. 278.) On October 18, 2007, Plaintiff reported improved focus and concentration, and that her racing thoughts had slowed. (Tr. 282.) Plaintiff reported similar improvement in November and December 2007. (Tr. 289, 292.)

On January 17, 2008, Nurse Bender reported that Plaintiff had stopped taking her medications because she could not afford them, and had relapsed. (Tr. 296.) Plaintiff reported depression, irritability and difficulty sleeping, concentrating and focusing. (*Id*.) Nurse Bender recommended that Plaintiff take Abilify. (Tr. 297-98.) On February 21, 2008, Plaintiff reported an improvement in her symptoms, noting that she was doing better in a class that she had previously failed. (Tr. 301.) She was using

4

"varied learning strategies" in her classes, including requesting more time for tests, and felt that her concentration had improved. (*Id*.) Plaintiff reported similar improvements in her concentration, or generally that her symptoms were stable, at appointments in April, June, July, October and December 2008. (Tr. 304-06, 308-10, 312-14, 420-21, 481-82.)[1]

On April 1, 2009, Melvin Painter, Ph.D,[2] noted that Plaintiff had been participating in "individual psychotherapy" since February 28, 2009, and that she complained of "significant depression (constant mood swings, low energy and motivation, limited appetite and interrupted sleep, socially withdrawn." (Tr. 744.) Dr. Painter opined that Plaintiff faced "significant stressors," including unemployment, caring for two children, and "conflictual relationships.[)]" (*Id*.) He observed that, when stressed, Plaintiff experienced periods of mania, and diagnosed her with bipolar disorder and moderate depression. (*Id*.)

On February 5, 2010, Plaintiff sought treatment from the emergency department at MetroHealth Medical Center, where she reported that she had been non-compliant with her medications for the previous six weeks, was experiencing tremors, and felt anxious and shaky. (Tr. 589-90.) She told the medical staff that her son's father had recently threatened her, and that she had been "in hiding" with her son because she

---

[1] In October 2008, Plaintiff was examined by Jyoti Aneja, whose credentials are not reflected in the record. (Tr. 420-21.) In December 2008, she was examined by Pablo Freije Ibanez, M.D. (Tr. 481-82.) Both Ms. Aneja and Dr. Ibanez were affiliated with MetroHealth.

[2] It does not appear from the record that Dr. Painter is affiliated with MetroHealth.

5

was afraid his father would take the boy from her. (Tr. 590.) After a psychiatric consult, Plaintiff was discharged with instructions to follow up with the Adult Psychiatry Clinic. (Tr. 593-94.) In March 2010, a social worker at MetroHealth's Community Mental Health Clinic closed Plaintiff's case, noting that, after attending one therapy session on February 24, 2010,[3] Plaintiff had not attended a subsequent appointment. (Tr. 597-98.)

On April 12, 2010, Plaintiff sought treatment from the MetroHealth emergency department, complaining of, *inter alia*, increased depression, difficulty sleeping and visual hallucinations after her son's father obtained emergency custody of the child and removed him from Plaintiff's care. (Tr. 601-02.) During a psychiatric consult, Pamela Budak, LISW, assigned Plaintiff a Global Assessment of Functioning ("GAF") of 41-50,[4] noting that Plaintiff was experiencing numerous stressors, including relationship problems, unemployment, housing problems and problems with the legal system. (Tr. 607.) Plaintiff was discharged with instructions to attend a follow-up appointment at the Community Mental Health Clinic on April 14, 2010. (Tr. 602-03.) Plaintiff did not attend that appointment. (Tr. 625.)

On June 24, 2010, Plaintiff again sought treatment from the MetroHealth emergency department, reporting that she was anxious and having difficulty sleeping. (Tr. 637-39.) She reported that she was not taking her medications. (Tr. 638.) After a

---

[3] The record of Plaintiff's February 24, 2010 appointment is not included in the evidence.

[4] A GAF score of 41-50 reflects "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

6

psychiatric consult, Plaintiff was discharged with instructions to make an appointment at the Community Mental Health Clinic.  (Tr. 641.)

On July 8, 2010, Plaintiff was examined by Kurtis C. Dornan, M.D., a family physician, complaining of anxiety arising out of her ongoing custody dispute with her son's father, and episodes of shaking.  (Tr. 733-34.)  Plaintiff reported that, although Abilify had previously controlled her symptoms, she did not think it was as effective as it had been.  (Tr. 733.)  Dr. Dornan prescribed Lorazepam and advised Plaintiff to consult with a psychiatrist to have her medications adjusted.  (Tr. 734.)  On August 3, 2010, Dr. Dornan noted that Plaintiff had not yet followed up with a psychiatrist.  (Tr. 736.)  Plaintiff reported that she had recently experienced a manic episode.  (*Id*.)  Dr. Dornan prescribed Lithium.  (*Id*.)  On August 6, 2010, Dr. Dornan noted that Plaintiff had not noted any significant relief from the Lithium, and had experienced another manic episode.  (Tr.740.)  There are no further records in evidence regarding Plaintiff's treatment for bipolar disorder.

### 2.     Treating Providers - Back Condition

On July 21, 2009, Plaintiff, complaining of lower back pain that had persisted throughout the previous two months, was examined by Pasha Saeed, M.D., at Euclid Hospital.  (Tr. 553-55.)  Plaintiff described the pain as throbbing and ranging from 4 to 8 out of 10.  (Tr. 555.)  Dr. Saeed diagnosed Plaintiff with lumbosacral neuritis, and prescribed Percocet and Ultram, and recommended that Plaintiff undergo a series of Transforaminal Epidural Steroid Injections ("TFESI").  (Tr. 559-60.)  Plaintiff received three TFESIs throughout August and September 2009.  (Tr. 551-52, 543-50.)

On September 30, 2009, Plaintiff presented to the emergency room at Euclid

7

Hospital, complaining of right-side numbness and tingling. (Tr. 497.) A CT scan of Plaintiff's lumbar spine on that date revealed multilevel osteophytes at L2, L3 and L4. (Tr. 531.) Neurologist Sheila Rubin, M.D., examined Plaintiff and diagnosed her with conversion disorder, likely due to stress. (Tr. 502-03.)

On October 13, 2009, Plaintiff was examined by Dr. Saeed, who noted Plaintiff's complaints of continued lower back pain, ranging from 5 to 7 out of ten, and tingling in her right arm. (Tr. 538-39.) Dr. Saeed diagnosed Plaintiff with lumbosacral spondylosis, and recommended that she undergo two medial branch nerve blocks ("MBNB") to treat her pain. (*Id*.). Plaintiff received MBNBs throughout November and December 2009. (Tr. 712-14, 708-09.)

In November 2010, Plaintiff complained of aching and throbbing lower back pain ranging from 5 to 8 out of 10. (Tr. 704-06.) She reported that she had received relief from the MBNBs that had lasted for four days. (*Id*.) Dr. Saeed recommended that Plaintiff undergo radio frequency ablation ("RFA") of L3-L4, L4-L5 and L5-S1. (Tr. 706.) On March 17, 2010, Plaintiff underwent RFA. (Tr. 691-94.) On April 6, 2010, Plaintiff complained of pain ranging from 6 to7 out of 10. (Tr. 674-77.) Dr. Saeed recommended that Plaintiff undergo a series of three lumbar epidural steroid injections ("LESI"), which Plaintiff received throughout May and June 2010. (Tr. 670-73, 667-69, 663-66.) On June 25, 2010, Plaintiff complained of pain ranging from 5 to 8 out of 10, as well as tripping and numbness. (Tr. 660-61.) Dr. Saeed recommended another series of TFESIs. (*Id*.) The record does not contain any further information regarding the treatment of Plainitff's back condition.

8

### 3. Agency Reports and Assessments

In an October 27, 2008 Function Report, Plaintiff indicated that her bipolar condition affected her understanding, memory, concentration and ability to complete tasks. (Tr. 163.) She wrote, "My understanding is limited. I have to write everything down to help me remember what to do. I have a really hard time concentrating without my meds." (*Id*.) She reported that her ability to follow spoken instructions was "not good." (*Id*.)

In a November 3, 2008 Psychiatric Review Technique, agency psychologist Bonnie Katz, Ph.D., diagnosed Plaintiff with bipolar disorder, but opined that it was not a severe impairment. (Tr. 460-73.) On January 18, 2009, agency psychologist Caroline Lewin, Ph.D., reviewed the November 2008 Psychiatric Review Technique and affirmed Dr. Katz's findings. (Tr. 489.)

### C. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified as follows as her administrative hearing:

Her back pain affected her ability to work because it was difficult to move in the morning. (Tr. 31.) She was receiving injections to treat the pain, but their relief lasted for only four days. (*Id.*) Her medical providers told her that she had an arthritic disc in her back caused by a childhood fall. (*Id.*) Plaintiff took medication for her bipolar condition, including Abilify, Ativan and Lithium. (Tr. 32.) She also took Percocet, Tramadol and Flexall. (*Id*.) She was not then undergoing psychotherapy because she was in the process of changing doctors. (*Id.*) She was not satisfied with her care at

9

MetroHealth because her appointments were frequently delayed, and because she was seen by a new resident every six months. (Tr. 32, 34-35.)

Plaintiff had recently surrendered custody of her son to his father because she felt it was best for the child, given her bipolar condition. (Tr. 33-34, 36.) She did not feel that her medications were controlling her condition "all the time," and she had recently experienced several manic episodes. (Tr. 34.) Plaintiff was taking Lithium, and felt that, on that medication, she did "pretty well" and could focus. (Tr. 35.) Her depression still ebbed and flowed, and she continued to feel anxious and worried, with rapid thoughts and thoughts of suicide. (*Id*.) When she tried to return to school, she was easily confused, and had failed a number of tests and courses. (Tr. 36.)

Plaintiff's back pain was not abated by any of the medications or treatments she had undergone. (Tr. 37.) She could not stand for long periods of time or walk more than a half block without experiencing pain. (*Id*.) Her daily activities varied depending on her mood. (*Id*.) Some days, she stayed in bed all of the time; others she "r[an] around the house for no reason." (*Id*.) Five out of seven days, she "just pretty much want[ed] to give up." (*Id*.)

### 2. VE Testimony

The ALJ posed the following hypothetical to the VE:

> Assume a hypothetical individual with the same age, education and work experience as the claimant in this case. With the following mental residual functional capacity that [the] individual can remember simple locations and procedures, can understand, remember and carry out short, simple instructions but not detailed instructions.

(Tr. 40-41.) The VE opined that, of Plaintiff's past relevant work, the hypothetical

individual described by the ALJ would be able to work only as a cashier, but not in a grocery store. (Tr. 41.) The ALJ altered the hypothetical to add that the individual could understand, remember and carry out detailed instructions. (*Id.*) The VE testified that the second hypothetical individual could perform Plaintiff's past relevant work as a data entry clerk, clerk typist and statement clerk. (Tr. 41-42.) In response to questions from Plainitff's counsel, the VE opined that an individual who would miss one to two days of work per week due to anxiety would not be able to perform any of Plaintiff's past relevant work. (Tr. 43-44.)

### III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks

disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Act through June 30, 2008.

2. The claimant has not engaged in substantial gainful activity since January 2, 2007, the alleged onset date.

3. The claimant has the following severe impairment: bipolar disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can remember simple locations and procedures and can understand, remember, and carry out short and simple instructions as well as detailed instructions.

6. The claimant is capable of performing past relevant work as a data entry clerk, clerk typist, and statement clerk. This work does not require the performance of work-related activities precluded by the claimant's RFC.

7. The claimant has not been under a disability, as defined in Act, from January 2, 2007 through the date of this decision.

(Tr. 14-20.) The ALJ noted the evidence of Plaintiff's back condition, but concluded that it was non-severe because it "did not cause significant functional limitations for a period of 12 consecutive months or more." (Tr. 14.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

13

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Arguments

#### 1. Back Condition

Plaintiff argues that there is insufficient evidence to support the ALJ's conclusion that her back condition was non-severe, and, further, that the ALJ failed to provide meaningful rationale for his conclusion. The Commissioner responds that Plaintiff points to no evidence in the record demonstrating that her back condition was a severe impairment, and, thus, substantial evidence in the record supports the ALJ's conclusion.

Plaintiff's arguments are not well taken. As a preliminary matter, even if the ALJ erred in concluding, at step two of his analysis, that Plaintiff's back condition was non-severe, that error is likely harmless. Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773

F.2d 85, 89 (6th Cir.1985). Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared. *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."). An ALJ must consider all of a claimant's impairments, severe and not severe, at every subsequent step of the sequential evaluation process. See 20 C.F.R. § 404.1545(e).

Here, although the ALJ concluded that Plaintiff's back condition was non-severe, he found that her bipolar condition was a severe impairment. Accordingly, Plaintiff cleared step two of the analysis. See *Anthony*, 266 F. App'x at 457.

To the extent that Plaintiff argues that her back condition was sufficiently severe to merit further limitations in her RFC, that argument lacks merit. It is well established that the claimant bears the burden of establishing the severity of the impairments that determine her RFC. See *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], *when the claimant is proving the extent of his*

15

*impairments.*") (emphasis added). Although the record contains evidence that Plaintiff sought frequent and ongoing treatment for lower back pain, she points to no evidence in the record that her back pain interfered with her ability to perform basic work activities. She offered no medical opinions to that effect, and no agency physician opined that her back condition left her unable to work or otherwise created restrictions on her ability to perform work activities. Rather, Plaintiff points to the medical records documenting her complaints of back pain, her physicians' diagnosis and treatment she received for her condition. This evidence, however, says nothing about the severity of Plaintiff's impairment. *See, e.g., [Foster v. Bowen,](#) 853 F.2d 483, 489 (6th Cir. 1988)* ("The mere fact that plaintiff suffered from a dysthymic disorder . . . does not automatically entitle plaintiff to the receipt of benefits. Rather, in order to qualify for the receipt of benefits . . . plaintiff must show that she was disabled by her dysthymic disorder."); *[Higgs v. Bowen,](#) 880 F.2d 860, 863 (6th Cir. 1988)* ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."). Accordingly, Plaintiff failed to sustain her burden of proof with respect to whether her lower back condition constituted a severe impairment that merited further limitations in her RFC.

Plaintiff also asserts that the ALJ's conclusion is unsupported by substantial evidence because he did not discuss the medical evidence related to her back condition. However, it is well established that "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *[Kornecky v. Comm'r of Soc. Sec.,](#) 167 F. App'x 496, 507-08 (6th Cir. 2010)*. Here, the ALJ stated that he had considered "the entire record," and concluded that the record did not demonstrate that Plaintiff's back condition had caused "significant

16

functional limitations for a period of 12 consecutive months or more." (Tr. 14.) The ALJ's decision on this issue provides a sufficient explanation for this Court's review, and, thus, Plaintiff's argument lacks merit.

### 2. Non-Extertional Limitations in Plaintiff's RFC

Plaintiff argues that the ALJ failed to explain sufficiently his reasons for including non-exertional limitations in her RFC. Specifically, Plaintiff argues that because the ALJ failed to explain the limitations on her ability to remember locations and procedures, and to understand, remember and carry out instructions, the RFC is supported by insufficient evidence. The Commissioner responds that, because the ALJ examined the medical evidence in the record, the ALJ's decision provides a sufficient basis for his conclusion regarding Plaintiff's non-exertional limitations.

Plaintiff's argument is not well taken. In his decision, the ALJ stated that he had reviewed the entire record, and concluded that Plaintiff had moderate difficulties with concentration, persistence or pace, noting, "the medical observations and conclusions, subjective complaints, and evidence of daily activities show that [Plaintiff] has sufficient concentration, persistence or pace to perform simple to detailed instructions." (Tr. 14, 15.) Further, the ALJ pointed to evidence in the record demonstrating that, when Plaintiff complies with her physicians' recommendations regarding her medications, her ability to concentrate improves, and she is able to perform well in school. (Tr. 17.) Accordingly, the decision sets forth sufficient rationale for this Court's review. Moreover, because medical evidence in the record supports the ALJ's conclusion, and because Plaintiff points to nothing in the record suggesting that her RFC should have included greater restrictions, substantial evidence supports the ALJ's conclusion

17

regarding Plaintiff's RFC.

### 3. Plaintiff's Credibility

Finally, there is no merit to Plaintiff's argument that the ALJ failed to explain his conclusion regarding Plaintiff's credibility. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, the ALJ's credibility determinations must be reasonable and based on evidence from the record. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983). The ALJ also must provide an adequate explanation for his credibility determination. "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.). Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

Here, the ALJ concluded that Plaintiff's allegations regarding the severity of her symptoms were not credible "due to lack of treatment and inconsistent statements." (Tr. 18.) Plaintiff asserts that the ALJ did not sufficiently explain the inconsistency on which he based his credibility finding. However, in his decision, the ALJ noted that

Plaintiff's testimony that her symptoms were not controlled by medication was inconsistent with the medical evidence demonstrating that, when she took her medication as directed, Plaintiff functioned well and experienced a decrease in the symptoms of her bipolar condition. (*Id*.) This inconsistency is evident in the record, as the medical records do reflect that Plaintiff's symptoms improved when she was compliant with her physicians' orders regarding her medication, and deteriorated when she was not taking her medications. (Tr. 264, 267, 274, 278, 289, 292, 296, 304-06, 308-10, 312-14, 420-21, 481-82.) This inconsistency is an appropriate basis for an adverse credibility finding. *See Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility . . . is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."). Accordingly, substantial evidence in the record supports the ALJ's adverse credibility determination.

## VI. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: September 26, 2012

## OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to**

**file objections within the specified time may waive the right to appeal the District Court's order.** See *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986).